# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

**KIM M. PETERS,**

   Plaintiff,

   v.                                                   Case No. 18-CV-811

**DIELECTRIC CORPORATION,**

   Defendant.

## DECISION AND ORDER ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Kim M. Peters sues her former employer, Dielectric Corporation, under the Americans with Disabilities Act Amendments Act of 2008 ("ADA"), 42 U.S.C. §12101 *et seq.* and the Family & Medical Leave Act ("FMLA"), 29 U.S.C. § 2601 *et seq.* Peters alleges that Dielectric discriminated against her based on disability and unlawfully interfered with her use of FMLA leave. Dielectric moves for summary judgment as to both claims, arguing that Peters was not a "qualified individual" under the ADA because she was unable to perform the essential functions of her job with or without accommodations. Dielectric further argues that Peters' FMLA claim is time-barred, or alternatively, that she was not entitled to FMLA leave because she was unable to perform the essential functions of her job. For the reasons explained below, Dielectric's motion for summary judgment is granted.

## FACTS

Dielectric is a custom fabrication company located in Menomonee Falls, Wisconsin. It manufactures and fabricates plastic and non-ferrous metals for the medical, food processing, and manufacturing industries, and also provides prototyping, component

assembly, packaging, and inventory management. In February 2016, it employed approximately ninety employees at its plant in Menomonee Falls, fifty-six of whom worked full-time in the manufacturing operation. (Defendant's Proposed Findings of Fact ("DPFOF") ¶ 1, Docket # 17 and Plaintiff's Resp. to DPFOF ("Pl.'s Resp.") ¶ 1, Docket # 29.) Todd Zimdars is Dielectric's Chief Financial Officer, responsible for the management and oversight of the organization's financial operations. (*Id.* ¶ 2.) Peters began working for Dielectric on August 2, 1993 and continued to work for Dielectric through February 22, 2016, when her employment was terminated. (*Id.* ¶ 3.)

Throughout most of her employment and continuing through February 15, 2016, Peters worked as an assembler in the Special Products Department, where she glued, buffed, polished, deburred, sanded, assembled, and packaged parts using a buffing machine and various hand tools, which required the repetitive use of both hands. (*Id.* ¶ 4.) On November 23, 2010, Peters claimed to have injured her back and neck while performing her duties at Dielectric. (*Id.* ¶ 5.) From on or about August 15, 2011 through June 27, 2013, Peters presented Dielectric with various work restrictions from her doctor in connection with her alleged work-related back and neck injuries. Those restrictions limited her to lifting no more than twenty pounds and working no more than thirty hours/week. (*Id.* ¶ 6.)

On August 14, 2012, Peters retained an attorney to represent her in connection with her claim for worker's compensation benefits. (*Id.* ¶ 19.) Dielectric's worker's compensation insurer retained Attorney Mark Miller to represent Dielectric in connection with Peters' worker's compensation claim. (*Id.* ¶ 20.) Peters treated with Dr. Edward Reshel for the back and neck injuries she suffered in connection with her claim for worker's compensation benefits. (*Id.* ¶ 21.)

In July 2013, Peters requested intermittent leave under the FMLA, submitting a July 23, 2013 medical certification from her chiropractor, Dr. Gehrung, in support of her request, which limited her to thirty hours of work per week. Dielectric granted her request. (*Id.* ¶ 7.) In January 2014, Peters again requested intermittent leave under the FMLA, submitting a January 17, 2014 medical certification from Dr. Gehrung in support of her request, which limited her to thirty hours of work per week. Dielectric granted her request. (*Id.* ¶ 8.) In February 2015, Peters again requested intermittent leave under the FMLA, submitting a February 25, 2015 medical certification from her doctor, James Buck, M.D., in support of her request, which limited her work to six hours per day (thirty hours per week). Dielectric granted her request. (*Id.* ¶ 9.)

On July 17, 2015, Peters' worker's compensation attorney filed a Practitioner's Report on Accident or Industrial Disease in Lieu of Testimony certified by Dr. Reshel on or about June 14, 2015, and a Physical Capacities Evaluation Form completed by Dr. Reshel on June 15, 2015. (*Id.* ¶ 22.) On August 14, 2015, Peters underwent a vocational assessment conducted by vocational experts Timothy J. Riley and Karrie Grady in connection with her claim for worker's compensation benefits. During the meeting, Peters explained what the duties of her job in the Special Products Department required. (*Id.* ¶ 24.) On September 25, 2015, in support of Peters' claim for worker's compensation benefits, her worker's compensation attorney filed a September 24, 2015 Vocational Expert and Vocational Assessment Report completed by Riley and Grady. (*Id.* ¶ 25.) The restrictions and limitations indicated in Dr. Reshel's June 2015 Physical Capacities Evaluation Form were permanent and in effect at all times from June 15, 2015 through at least February 23, 2019. (*Id.* ¶ 26.)

From July 2013 through February 15, 2016, Peters worked in her position in the Special Products Department on intermittent leave under the FMLA, subject to the twenty-pound lifting and thirty-hour/week restrictions provided in the various medical certifications she presented to Dielectric. (*Id.* ¶ 10.) Peters used intermittent leave under the FMLA to work part-time in her position at Dielectric for three and a half years, from July 2012 through mid-February 2016. (*Id.* ¶ 11.)

In early February 2016, Dielectric began having issues meeting production demands for one of its major customers. (*Id.* ¶ 12.) As a result, Dielectric informed all of the employees in the Special Products Department (including Peters) that, effective February 15, 2016, all employees in the department would be scheduled to work eight-hour shifts, five days per week, and may be required to work mandatory overtime. (*Id.* ¶ 13.) When the decision was made to eliminate part-time work in the Special Products Department, Zimdars and Dielectric's Chief Operating Officer, Perry Pabich, knew that Peters was working thirty hours a week, using FMLA to cover her time off, and working subject to a twenty-pound lifting restriction. (*Id.* ¶ 14.) In order to accommodate her restrictions, they decided to transfer her to the Shipping Department, where she would be able to continue working part-time, within her lifting restriction, effective February 15, 2016. (*Id.*)

On February 15, 2016, Peters began working in the Shipping Department, subject to her thirty-hour/week, twenty-pound lifting restriction. (*Id.* ¶ 17.) At the same time, in connection with the decision to transfer Peters to the Shipping Department, Zimdars requested and reviewed the most recent medical certification Peters submitted to support her leave, a February 25, 2015 medical certification from Dr. Buck. (*Id.* ¶ 15.) When Zimdars reviewed Dr. Buck's February 25, 2015 medical certification, he noted that the "duration"

of Peters' thirty-hour work restriction was listed as "chronic," which concerned him because "chronic" did not specify any temporal duration, but rather implied that the restriction was indefinite and permanent. (*Id.* ¶ 16.) As a result, when Peters reported to work on February 15, 2016, Zimdars asked her to have her physician clarify the meaning of "chronic" in the February 25, 2015 medical certification. (*Id.*) Zimdars never followed up with Peters on his request and never told her what might happen if she did not provide the requested information. (Pl.'s Proposed Findings of Fact ("PPFOF") ¶ 26, Docket # 27 and Def.'s Resp. to PPFOF ("Def.'s Resp.") ¶ 26, Docket # 32.) Peters did not receive the requested medical information back from her doctor to provide before Dielectric terminated her employment. (*Id.*)

The parties dispute when Dielectric learned of Peters' permanent work restrictions. Dielectric asserts that after meeting with Peters on February 15, 2016 and requesting clarification of the word "chronic" in her February 25, 2015 medical certification, Zimdars reviewed an email he had received earlier that morning from Attorney Miller updating him on Peters' claim for workers' compensation benefits. (*Id.* ¶ 29.) Attached to Miller's email were a number of documents, including the September 24, 2015 Vocational Assessment Report prepared by Peters' vocational experts. (*Id.*) Dielectric states that when Zimdars reviewed the September 24, 2015 Vocational Assessment Report, he discovered the following previously unknown representations regarding Peters' work ability: "Peters works 30 hours per week and said that she 'can't even do 30 without pain . . . She works with her sister, who helps her with lifting/bending/carrying.'" (*Id.* ¶ 30.)

Dielectric argues that the September 25, 2015 report referenced the June 17, 2015 report and Physical Capacities Evaluation Form completed by Dr. Reshel, which Zimdars

had never seen. (*Id.* ¶ 31.) According to the vocational report, Dr. Reshel had issued Peters a number of permanent restrictions that she never presented to the company, including a restriction against using either hand or both hands to perform repetitive work—which was the essence of her job in the Special Products Department, as well as the position she was just assigned in the Shipping Department. (*Id.* ¶ 31.) The September 24, 2015 Vocational Assessment Report also contained the following conclusion from Peters' vocational experts about her ability to perform her job at Dielectric: "Based upon the restrictions of Dr. Reshel, it is my professional opinion that Ms. Peters' current position at Dielectric is beyond that of the above restrictions. She is performing repetitive work with her hands/upper extremities. She is frequently reaching at waist level, or below waist, handling, finger, feeling, etc. This is a benevolent employer. She is receiving significant accommodations, which she would not likely receive in the general labor market." (*Id.* ¶ 32.)

Dielectric states that on February 16, 2016, Zimdars emailed Attorney Miller, asking him to provide a copy of Dr. Reshel's June 15, 2015 report, as well as Peters' Physical Capacities Evaluation Form. (*Id.* ¶ 33.) When Zimdars reviewed Dr. Reshel's June 15, 2015 Physical Capacities Evaluation Form, he discovered that Peters had the following permanent restrictions on her ability to work: Occasional lifting up to twenty pounds, with no lifting of more than twenty pounds (Restriction II); occasional reaching at the waist and handling (Restriction IV); and no repetitive use of either or both hands (Restriction V). (*Id.* ¶ 34.) Thus, Dielectric asserts that it was unaware of Peters' permanent work restrictions prior to February 15, 2016. (*Id.* ¶ 27.)

Peters asserts, however, that because her worker's compensation attorney filed the medical reports with the State on September 25, 2015, this constituted notice to Dielectric of

the reports. (Pl.'s Resp. to DPFOF ¶¶ 27, 30–31, 33, 35–36, 39–40, 47.) However, Peters testified that she herself was unaware of her permanent restrictions until Dielectric showed them to her on February 22, 2016 and that she never presented them to Dielectric. (Declaration of Alan E. Seneczko, ¶ 2, Deposition of Kim Peters ("Peters Dep.") at 28–29, Docket # 21.)

Peters did not report for work as scheduled on February 18, 2016. Instead, she called in reporting neck and shoulder pain, stating that her doctor had released her from work until February 22, 2016. (DPFOF ¶ 38 and Pl.'s Resp. ¶ 38.) During Peters' absence, on February 18, 2016, Zimdars met with Pabich, Kurt Ebeling (the Plant Manager), and Denise Ewert (the Human Resource Manager), to review Peters' permanent restrictions. (*Id.* ¶ 39.) They concluded that, in the absence of any further information from Peters, she was unable to perform the essential functions of her jobs in the Shipping and/or Special Products Departments, and that no accommodations could be provided that would enable her to do so, especially given her permanent restriction against the repetitive use of either or both of her hands—the same conclusion reached by her vocational experts in their September 24, 2015 Vocational Assessment Report. (*Id.*) As a result, the company had no work for her and would have to lay her off. (*Id.*) During the meeting, Zimdars and Pabich also concluded that, given Peters' permanent restrictions and inability to perform the essential functions of her job, there was no need or obligation to provide her with further leave under the FMLA, and no further need to clarify the meaning of "chronic" in the February 25, 2015 medical certification. (*Id.* ¶ 40.)

Pabich and Ewert met with Peters when she returned to work on February 22, 2016. (*Id.* ¶ 41.) Peters was presented with a copy of Dr. Reschel's June 15, 2015 Physical

7

Capacities Evaluation Form, and Peters agreed with the restrictions it contained were accurate, appropriate, and permanent. (*Id.*) However, Peters asked to return to the Special Products Department, stating that she "was fine in Special Products." (*Id.*) Pabich responded to Peters' request to return to her position in Special Products by stating that, regardless of whether she worked full or part-time, the requirements of the job in the Special Products Department exceeded her permanent restrictions. (*Id.* ¶ 42.) He further stated that there was nothing the company could do to accommodate such extensive physical limitations and asked if she thought there were any positions in the plant that she could perform within her restrictions. Peters said there were not and offered nothing further. (*Id.*) Pabich concluded the meeting by informing Peters that she was being laid off for lack of work and handing her a Notice of Layoff, with Dr. Reshel's Physical Capacities Evaluation Form attached. (*Id.* ¶ 43.) Peters acknowledges that her positions in the Special Products and Shipping Departments required the repetitive use of both hands, which was prohibited by her restrictions, and that, according to her permanent restrictions, she was unable to perform either of the jobs. (*Id.* ¶ 46.)

## SUMMARY JUDGMENT STANDARD

Pursuant to Fed. R. Civ. P. 56(a), a party can seek summary judgment upon all or any part of a claim or defense asserted. The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). "Material facts" are those under the applicable substantive law that "might affect the outcome of the suit." *See Anderson*, 477 U.S. at 248. The mere existence of some factual

dispute does not defeat a summary judgment motion. A dispute over a "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

In evaluating a motion for summary judgment, the court must draw all inferences in a light most favorable to the nonmovant. *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). However, when the nonmovant is the party with the ultimate burden of proof at trial, that party retains its burden of producing evidence which would support a reasonable jury verdict. *Celotex Corp.*, 477 U.S. at 324. Evidence relied upon must be of a type that would be admissible at trial. *See Gunville v. Walker*, 583 F.3d 979, 985 (7th Cir. 2009). To survive summary judgment, a party cannot rely on his pleadings and "must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 248. "In short, 'summary judgment is appropriate if, on the record as a whole, a rational trier of fact could not find for the non-moving party.'" *Durkin v. Equifax Check Services, Inc.*, 406 F.3d 410, 414 (7th Cir. 2005) (citing *Turner v. J.V.D.B. & Assoc., Inc.*, 330 F.3d 991, 994 (7th Cir. 2003)).

**ANALYSIS**

Peters sues Dielectric for discrimination under the ADA and for FMLA interference. Dielectric has moved for summary judgment as to both claims. I will address each claim in turn.

   1.   *ADA Discrimination*

Peters alleges that Dielectric discriminated against her based on disability by refusing to accommodate her disability and by terminating her employment because of her disability. (Pl.'s Resp. Br. at 6, Docket # 30.) The ADA prohibits an employer from discriminating

9

against a qualified individual on the basis of disability "in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). The ADA also requires employers to make reasonable accommodations for the known physical or mental impairments of an otherwise qualified individual with a disability. *Id.* § 12112(b)(5)(A).

To prevail on a claim of discrimination under the ADA, a plaintiff must show that: (1) she is disabled under the ADA; (2) she is qualified to perform the essential functions of the job, either with or without reasonable accommodations; and (3) she suffered an adverse employment action. *Heatherly v. Portillo's Hot Dogs, Inc.*, 958 F. Supp. 2d 913, 919 (N.D. Ill. 2013) (citing *Hoppe v. Lewis Univ.*, 692 F.3d 833, 838–39 (7th Cir. 2012)). Dielectric concedes Peters can establish the first and third elements of her *prima facie* case; Dielectric argues, however, that Peters cannot show the second element—that she is qualified to perform the essential functions of the job, either with or without reasonable accommodations.

A "qualified individual" under the ADA is defined as "an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C.A. § 12111(8). Determining whether a person is a "qualified individual" is a two-step process. *Wheatley v. Factory Card & Party Outlet*, 826 F.3d 412, 417 (7th Cir. 2016). First, the person must satisfy the prerequisites for the position, such as possessing the proper educational background, employment experience, skills, or licenses. *Id.* Second, the person must be able to perform the essential functions of the position held with or without reasonable accommodation. *Id.* The plaintiff bears the burden of proof on this issue; she must be able to show that she is a

10

"qualified individual with a disability" in order to successfully prosecute an ADA claim. *Weiler v. Household Fin. Corp.*, 101 F.3d 519, 524 (7th Cir. 1996). Only the second prong of that two-part process is at issue here.

Dielectric argues for summary judgment in its favor on the grounds that Peters is not a qualified individual with a disability under the Act. While Peters asserts that she is a "qualified individual," she does nothing more than make a conclusory statement that she "was able to perform the essential functions of her job with an accommodation from her employer." (Pl.'s Resp. Br. at 7.)[1] But the record evidence, including Peters' own testimony, belies this assertion. Peters admits that both her positions in the Special Products Department and the Shipping Department require the repetitive use of her hands and that her doctor permanently restricted her from any repetitive use of her hands. (DPFOF ¶ 46 and Pl.'s Resp. ¶ 46; Peters Dep. at 22, 31.) Peters does not suggest that other positions existed within Dielectric that she was otherwise qualified to perform within her medical restrictions, and Dielectric is not obligated under the ADA to "bump" other employees to create a vacancy so as to be able to reassign her or to create a "new" position for her. *See Gile v. United Airlines, Inc.*, 95 F.3d 492, 499 (7th Cir. 1996). Peters does not suggest an accommodation that would have allowed her to perform the handling aspect of the job.

Rather, Peters argues that after sustaining her work injury in late 2010, she successfully worked in Dielectric's Special Products Department from July 2012 through mid-February 2016 because Dielectric "largely accommodated [Peters'] disabilities and

---

[1] Peters also incorrectly conflates "disability" with "qualified individual." She argues that Dielectric's assertion that she is not a qualified individual with a disability is "easily disposed of" because Dielectric cited cases predating the 2009 amendments to the ADA. (Pl.'s Resp. Br. at 6.) But the 2009 amendments to the ADA expanded the definition of "disability" and its related elements; it did not change the definition of "qualified individual." Dielectric does not challenge whether Peters has a "disability" within the meaning of the Act. (Def.'s Reply Br. at 3, Docket # 31.)

medical restrictions." (Pl.'s Resp. to DPFOF ¶ 45.) However, at the time of her work injury, Peters' doctors restricted her to working thirty hours per week and lifting no more than twenty pounds. Dielectric accommodated these restrictions by allowing her to use intermittent FMLA leave for ten hours every week and by limiting her to lifting no more than twenty pounds. Peters argues that Dielectric involuntarily transferred her to the Shipping Department in 2016 and she "was fine in Special Products." (Pl.'s Resp. to DPFOF ¶ 41.) Peters admits, however, that this transfer occurred because Dielectric was eliminating part-time work in the Special Products Department and the transfer was necessary to keep accommodating her thirty-hour per week work restriction. (DPFOF ¶ 14 and Pl.'s Resp. ¶ 14.)

Peters also argues that the Shipping Department position required "different duties" than the duties she had been successfully performing under the same medical restrictions in the Special Products Department. (Pl.'s Resp. Br. at 14 and PPFOF ¶ 17.) Her medical restrictions, however, changed in February 2016. Dielectric asserts that it first learned that Peters' doctor permanently restricted her from all repetitive use of her hands in mid-February 2016 and terminated her employment on February 22, 2016 because it lacked work within her restrictions. (DPFOF ¶ 3.) Peters' principal argument in response is that Dielectric effectively knew about her permanent restrictions regarding the use of her hands in September 2015, when her worker's compensation attorney filed the medical reports containing these restrictions with the State. (Pl.'s Resp. to DPFOF ¶¶ 27, 30–31, 33, 35–36, 39–40, 47.) She argues that Dielectric failed to engage in an interactive process to determine if any reasonable accommodations were, in fact, available. (Pl.'s Resp. Br. at 10–13.) These arguments fail. First, "[a]n *employee* begins the accommodation process by notifying her

employer of her disability; at that point, an employer's liability is triggered for failure to provide accommodations." *Spurling v. C & M Fine Pack, Inc.*, 739 F.3d 1055, 1061 (7th Cir. 2014) (internal quotation and citation omitted) (emphasis added). Dielectric was clearly accommodating Peters' known restrictions after she sustained the work injury in 2010—working thirty hours per week and lifting no more than twenty pounds.

But the limitation at issue now is different—the inability to repetitively use both hands. Peters does not explain how or why filing documents with the State in connection with her worker's compensation claim specifically notices Dielectric of her hand limitations. She does not assert that Zimdars, Pabich, or anyone else at Dielectric were copied on these filings. In fact, Peters herself claims that even *she* did not know about these permanent restrictions regarding the use of her hands until Pabich showed them to her on February 22, 2016. (Peters Dep. at 29.) She agrees that she never brought the restrictions to Dielectric's attention. (*Id.*) Why should Dielectric be tasked with knowledge of an employee's restriction that the employee herself allegedly does not know about?

But even assuming that Dielectric's knowledge of her handling restriction in either September 2015 or February 2016 triggered the need to begin an interactive process, "an employer's failure to engage in the interactive process alone is not an independent basis for liability[;] it is actionable [only] 'if it prevents identification of an appropriate accommodation for a qualified individual.'" *Spurling*, 739 F.3d at 1062 (quoting *Basden v. Prof'l Transp., Inc.*, 714 F.3d 1034, 1039 (7th Cir. 2013)). The employee must show that a reasonable accommodation could be made that would enable her to carry out the essential functions of her job. *Id.* Once again, Peters agrees that both positions required the repetitive use of her hands and her permanent medical restrictions prohibited this. (Peters Dep. at 22,

31; DPFOF ¶ 46 and Pl.'s Resp. ¶ 46.) Thus, looking at the record as a whole, no rational trier of fact could find that Peters could perform the essential functions of her job, either with or without reasonable accommodations. For this reason, she is not a "qualified individual" under the ADA and her claims under the statute fail.

Dielectric alternatively argues that Peters is judicially estopped from contending that she is a "qualified individual" under the ADA based on her assertions in both her worker's compensation claim and her application for Social Security disability benefits that she was unable to perform her job at Dielectric. (Def.'s Br. at 8–10.) Although it is true, as Peters asserts, that "determinations made by the Social Security Administration concerning disability are not dispositive findings for claims arising under the ADA," *Weiler*, 101 F.3d at 524, they are also not irrelevant. As the Seventh Circuit explained:

> [R]eceipt of Social Security disability benefits does not automatically disqualify a person from making a claim under the Americans with Disabilities Act. The Social Security system classifies many situations on a categorical basis, using presumptions ("listings") and rules (such as "the grids") that may result in awards of benefits to persons who are able to work (at least with a reasonable accommodation) . . . . [C]ontradictions [, however,] are unacceptable: a person who applied for disability benefits must live with the factual representations made to obtain them, and if these show inability to do the job then an ADA claim may be rejected without further inquiry

*Opsteen v. Keller Structures, Inc.*, 408 F.3d 390, 392 (7th Cir. 2005). Peters specifically represented in her application for Social Security disability benefits that she cannot "do anything repetitive with hands." (Pl.'s Resp. to DPFOF ¶ 50.) She similarly represented in her worker's compensation case that she was restricted from engaging in any repetitive movements of the hands. (Pl.'s Resp. to DPFOF ¶ 55.) Peters cannot have it both ways— she cannot assert an inability to do anything repetitive with her hands in the hopes of

14

obtaining disability or worker's compensation benefits, while at the same time present herself as able to perform the essential functions of her job at Dielectric, which includes repetitive use of the hands, in order to secure employment. *See Opsteen*, 408 F.3d at 392. For these reasons as well, Peters ADA claim fails and summary judgment is granted in favor of Dielectric.

    2.    *FMLA Interference*

Peters further alleges that Dielectric interfered with her use of FMLA leave by refusing to allow her to obtain an updated medical certification before terminating her employment on February 22, 2016. Dielectric argues that the FMLA claim is barred by the statute of limitations. Alternatively, Dielectric argues that Peters was not entitled to FMLA leave because she could not perform the essential functions of her position.

I need not address Dielectric's statute of limitations argument because, as stated above, Peters' inability to perform an essential function of the job dooms her FMLA claim. The FMLA makes it unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise rights under the FMLA. 29 U.S.C. § 2615(a)(1). An employee on FMLA leave has the right to be restored to the same or an equivalent position that the employee had before he took leave. 29 U.S.C. § 2612. However, if an employee cannot perform an essential function of his original position because of a physical or mental condition, the employee has no right to restoration to a different position under the FMLA. 29 C.F.R. § 825.216(c); *James v. Hyatt Regency Chicago*, 707 F.3d 775, 780 (7th Cir. 2013).

Peters argues that she had been using intermittent FMLA leave for several years to work thirty hours per week in the Special Products Department and when Dielectric transferred her to the Shipping Department, Dielectric intended to allow Peters to continue

using intermittent FMLA leave to work thirty hours per week. (Pl.'s Resp. Br. at 19.) Peters argues, however, that Dielectric terminated her employment before allowing her to seek clarification from her doctor regarding her medical restrictions. (*Id.* at 17.)

But what clarification does Peters believe Dielectric should have allowed her to obtain? She now states there is a "conflict in the medical restrictions" provided by her doctors. (Pl.'s Resp. Br. at 17.) Dielectric did ask for clarification of the word "chronic," to ensure that her restrictions were indeed permanent. But again, Peters' testimony does not dispute that the essential functions of both the job in the Special Products Department and the Shipping Department required the repetitive use of her hands and that her medical restrictions were correct, permanent, and precluded the repetitive use of her hands. (Pl.'s Resp. to DPFOF ¶¶ 32, 34; Peters Dep. at 31, 38 and Ex. 3.) If Peters now asserts that her medical condition was either not permanent or that the restriction regarding repetitive use of her hands was incorrect, that defies her assertions in her Social Security disability application, her worker's compensation case, and her testimony in this case. While Dielectric had been granting Peters intermittent FMLA leave for years, once it learned through her doctor's restrictions that she could no longer perform the essential functions of the job (i.e., the repetitive use of her hands), Dielectric had no duty under the FMLA to return Peters to her position. *See James*, 707 F.3d at 780–81. Even viewing the evidence in this case in the light most favorable to Peters, Dielectric is entitled to summary judgment because Peters has failed to show that Dielectric interfered with her FMLA rights.

## CONCLUSION

Dielectric argues that summary judgment in its favor is warranted because Peters cannot perform the essential function of her job—repetitively using her hands. Peters' own

testimony that her positions required the repetitive use of her hands and that her doctor permanently restricted her from doing so dooms her claims under the ADA and the FMLA. There is no way to construe the facts such that a reasonable jury could find in Peters' favor. Dielectric's motion for summary judgment is granted and this case is dismissed.

## ORDER

**NOW, THEREFORE, IT IS ORDERED** that the defendant's motion for summary judgment (Docket # 16) is **GRANTED**. The clerk of court will enter judgment accordingly.

Dated at Milwaukee, Wisconsin this 17th day of October, 2019.

BY THE COURT:

*s/Nancy Joseph*
NANCY JOSEPH
United States Magistrate Judge